UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BHP ENGINEERS UK LTD. and
BHP ENGINEERS LTD.,

        Plaintiffs,

        v.                                          Case No. 06-C-0926

REXNORD INDUSTRIES INC.,

        Defendant.

---

**DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFFS' RENEWED MOTION TO COMPEL**

---

### I. PROCEDURAL AND FACTUAL BACKGROUND

The plaintiffs, BHP Engineers UK Ltd. and BHP Engineers LTD. (collectively "BHP"), commenced this action by filing a complaint naming Rexnord Industries Inc. ("Rexnord") as the defendant. The complaint contains one count seeking a declaratory judgment. BHP invoked this court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds $75,000.

At issue is the meaning of a Confidential Settlement Agreement ("CSA") the parties entered into on August 2003, which provided BHP with after-market exclusivity. Prior to the CSA, the parties' relationship was governed by a Value Added Distributor Agreement ("VAD") dated May 9, 2001. The CSA was agreed upon to resolve a dispute regarding alleged failures of elevator chain supplied by Rexnord to BHP. The VAD expired on May 9, 2006.

BHP seeks a declaration that Rexnord must honor BHP's after-market exclusivity, regardless of the expiration of the VAD. Rexnord, on the other hand, argues that the after-market exclusivity agreement was merely an amendment to the pre-existing VAD, and that BHP's after-market exclusivity ended when the VAD expired.

Currently pending before the court is the defendant's motion for summary judgment, the plaintiffs' motion for summary judgment, and the plaintiff's renewed motion to compel, all of which are fully briefed and are ready for resolution. For the reasons which follow, the plaintiffs' motion for summary judgment will be denied, and Rexnord's motion for summary judgment will be granted. The plaintiff's renewed motion to compel will be denied as moot.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiffs' motion for summary judgment was accompanied by a set of proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts in this case.

BHP Engineers Ltd. is an India-based engineering company that, as part of its work, sells conveying equipment, including bucket elevators, to cement mills in India. (Plaintiffs' Proposed Findings of Fact ("PPFOF") ¶ 1; Defendant's Proposed Findings of Fact ("DPFOF") ¶ 2.) BHP Engineers UK Ltd. is organized under the laws of the United Kingdom and maintains its principal place of business in the United Kingdom. (DPFOF ¶ 1.)

Rexnord is a Delaware corporation with its principal place of business in Wisconsin. (DPFOF ¶ 3.) Rexnord makes, among other things, elevator chain used in BHP's bucket elevators

(DPFOF ¶ 7.) Rexnord has sold Rexnord products to BHP for resale in India since 1982. (DPFOF ¶ 8.)

In 2001, Rexnord and BHP entered into a VAD, which appointed BHP as a distributor of certain Rexnord products in several countries, including India, Bangladesh, Sri Lanka, Mauritius, the Malvies, Myanmar, and Nepal. (DPFOF ¶ 10; PPFOF ¶ 11.)

Section 3.1 of the VAD appoints BHP the exclusive distributor in India for new installations and equipment. That provision reads as follows:

> 3. Territory and Appointment. The Company hereby appoints VAD, its Value Added Distributor, for component utilized in New Equipment Installations in the markets in the geographic area as set forth in Schedule B. (The markets and area are referred to in this Agreement as the "Customers" and the "Territory," respectively.) The VAD's sole remuneration for these direct to the Customer sales shall be the difference between its purchase price for the Product and the price charged its customers.
>
> 3.1 The appointment shall be on an exclusive basis for components for New Equipment Installations and retrofits. By exclusive is meant that the company will not appoint additional distributors in the Territory to market the Products to new installations.

(DPFOF ¶ 11; McGrath Decl. ¶ 2, Ex. A; McGrath Decl. ¶ 9, Ex. L.)

Section 3.2 of the VAD states that "The appointment shall be non-exclusive for all Replacement Parts."[1] (DPFOF ¶ 12.)

Over the course of their relationship, BHP and Rexnord had several disputes, including a dispute over certain alleged failures of the chain supplied by Rexnord to BHP. BHP alleged that certain types of chain supplied by Rexnord were defective. (DPFOF ¶ 13.)

---

[1] The parties dispute whether BHP was the exclusive distributor for replacement parts, given their course of dealing. (Plaintiff's Response to DPFOF ¶ 12.)

Mike Andrzejewski of Rexnord and Ajay Batra of BHP met in London, England on July 8, 2003 in an effort to resolve the differences between Rexnord and BHP. (DPFOF ¶ 16.) After this meeting, the parties exchanged five drafts of the proposed settlement agreement until they reached a mutually agreeable final version. (DPFOF ¶ 17.) The final version of the settlement, known as the Confidential Settlement Agreement ("CSA") was dated August 20, 2003. (DPFOF ¶ 18.)

Included in the CSA is Rexnord's agreement to pay BHP a sum certain and provide a substantial amount of free replacement chain. (DPFOF ¶ 19.)

Paragraph 1 of the CSA provides that:

> BHP further agrees to hold Rexnord harmless from any end-user claims with respect to any and all stated or implied warranties that may have been provided by BHP to its end-customers on Rexnord product shipped prior to January 2002.

(DPFOF ¶ 30; McGrath Decl. ¶ 4, Ex. C.)

Rexnord also promises in the CSA to give BHP the exclusive right to sell replacement parts in the territory BHP had established. Specifically, the CSA states: "Rexnord also agrees to provide BHP with after-market exclusivity on existing and future BHP installations within the VAD territory."

(PPFOF ¶ 10; McGrath Decl. ¶ 4, Ex. C at 2.)

This after-market exclusivity clause is found in paragraph 2 of the CSA, which paragraph provides as follows:

> 2. Reaffirmation of VAD
>
> Both parties reaffirm the validity and supremacy of the terms and conditions contained in the VAD and specifically acknowledge and agree that the terms of the VAD govern all prior and future transactions between the parties . . . . Rexnord agrees to hold its current prices firm on the chain supplied to BHP until July 1, 2005. Rexnord also agrees to provide BHP with after-market exclusivity on existing and future BHP installations within the VAD territory. In addition, Rexnord agrees to

modify the warranty terms in the VAD from 18 months after shipment to 24 months after shipment, or 18 months after commissioning, whichever is earlier. . . . The VAD will be amended to incorporate these changes.

(DPFOF ¶ 22; McGrath Decl. ¶ 4, Ex. C at 2; McGrath Decl. ¶ 9, Ex. L.)

"After-market exclusivity" is a term of art. In this case, it refers to the demand for replacement parts for elevator installations after the initial installation. (PPFOF ¶ 12.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce

5

affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.'" *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252). Because the parties in this case have filed cross motions for summary judgment, the court must extend the required favorable inferences to each when considering the other's motion. *See McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 687 (7th Cir. 1991).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**III. DISCUSSION**

At issue in this case is whether BHP's right to after-market exclusivity expired along the expiration of the VAD on May 9, 2006, or whether this right to after-market exclusivity is unlimited by time. Both parties assert that the plain language of the CSA supports their respective positions.

"Absent ambiguity within the document, the construction of a contract presents a question of law." *Koenings v. Joseph Schlitz Brewing Co.*, 126 Wis. 2d 349, 366, 377 N.W.2d 593, 602 (Wis. 1985). In the case of an unambiguous contract, "'the office of judicial construction is . . . to determine what the parties contracted to do; not necessarily what they intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use.'" *Id*. (quoting *Miller v. Miller*, 67 Wis. 2d 435, 442, 227 N.W.2d 626 (Wis. 1975)). "The general rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 9, 485 N.W.2d 217, 220 (Wis. 1992). Moreover, "[c]ontract terms being construed should be considered in context." *Wausau Joint Venture v. Redevelopment Auth.*, 118 Wis. 2d 50, 58, 347 N.W.2d 604, 608 (Wis. Ct. App. 1984). "Contracts must be read in such a manner as to give a reasonable meaning to each provision and without rendering any portion superfluous." *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd. P'ship.*, 273 Wis. 2d 577, 597, 682 N.W.2d 839, 849 (Wis. 2004).

At issue in this case is the meaning of the after-market exclusivity clause within paragraph 2 of the CSA, which paragraph reads as follows:

### 2. Reaffirmation of VAD

> Both parties reaffirm the validity and supremacy of the terms and conditions contained in the VAD and specifically acknowledge and agree that the terms of the VAD govern all prior and future transactions between the parties including, but not limited to, the representations, warranties, limitations of liability and remedies set forth therein. Rexnord agrees to hold its current prices firm on the chain supplied to BHP until July 1, 2005. **Rexnord also agrees to provide BHP with after-market exclusivity on existing and future BHP installations within the VAD territory.** In addition, Rexnord agrees to modify the warranty terms in the VAD from 18 months after shipment to 24 months after shipment or 18 months after commissioning, whichever is earlier. This is to be introduced to account for intransit shipping times and forward stocking, thus effectively providing BHP with similar warranties as would be available to the domestic European distributors of Rexnord. The VAD will be amended to incorporate these changes and a current price list will be attached to the agreement.

(McGrath Decl. ¶ 4, Ex. C at 2; McGrath Decl. ¶ 9, Ex. L.) (emphasis added).

The controlling question in this case is whether the exclusivity clause in paragraph 2 of the CSA was an amendment to the VAD, or a new term with a life separate from the VAD. Both parties contend that the plain language of paragraph 2 is unambiguous, and can only have one reasonable interpretation.

BHP argues that the plain language of the CSA demonstrates that the after-market exclusivity clause was a separate agreement to settle the parties' legal disputes, and not merely an amendment to the VAD. According to BHP, the exclusivity clause was written to last for the life of the installations that BHP developed in the VAD territory, and that, as an agreement separate from the VAD, its life is not tied to the VAD.

In contrast, Rexnord argues that the after-market exclusivity language in paragraph 2 of the CSA merely modifies the VAD, and that the life of BHP's right to after-market exclusivity is thus tied to the life of the VAD. Rexnord contends that the after-market exclusivity clause is one of three

amendments to the VAD found in paragraph 2 of the CSA, namely: (1) Rexnord agreed to fix prices until July 1, 2005; (2) Rexnord agreed to provide BHP with after-market exclusivity; and (3) Rexnord agreed to modify the warranty terms in the VAD. (Def.'s Br. at 6.)

As support for its contention that all three of the changes in paragraph 2 are merely amendments to the VAD rather than an agreement separate from the VAD, Rexnord points to language in paragraph 2 which affirms the supremacy of the VA, which states that exclusivity was being granted within the "VAD territory," and which states that "these changes" would be incorporated into the VAD.

First, Rexnord notes that in the first sentence of paragraph 2, the parties reaffirm "the validity and supremacy of the terms and conditions contained in the VAD and specifically acknowledge and agree that the terms of the VAD govern all prior and future transactions between the parties." As such, according to Rexnord, the exclusivity rights granted in paragraph 2 are rights which are governed by the VAD.

Second, Rexnord argues that the explicit reference to the "VAD territory" means that the VAD must be controlling. Without the existence of the VAD, according to Rexnord, there is no "VAD territory."

Third, Rexnord notes that the last sentence of paragraph 2 states that the "VAD will be amended to incorporate these changes." Rexnord contends that the phrase "these changes" means that all three changes listed above that last sentence are amendments to the VAD.

In response, BHP argues that the supremacy clause in the first sentence of paragraph 2 states that only prior or future transactions are covered by the VAD; that this language does not include the present terms of the CSA. As to the sentence stating that exclusivity was being granted within the

9

"VAD territory," BHP contends that this term merely defines what territory is covered (namely India, Bangladesh, Sri Lanka, Mauritius, the Maldives, Myanmar, and Nepal), but is not being used to link the exclusivity clause in the CSA with the VAD. In regards to whether the sentence stating that the "VAD will be amended to incorporate these changes" refers to three different amendments, BHP argues that the phrase "these changes" only refers to the warranty modifications, and does not include the exclusivity clause. (Pl.'s Reply Br. at 11-12.)

BHP also notes that there is no language in the CSA explicitly stating that the exclusivity clause would expire with the VAD, or that the after-market exclusivity was limited by the VAD. BHP points out that, in contrast, the clause immediately preceding the exclusivity clause does have a explicit expiration date. Specifically that clause reads: "Rexnord agrees to hold its current prices firm on the chain supplied to BHP until July 1, 2005." BHP contends that the existence of an expiration date for one clause, and the lack of an expiration date for the exclusivity clause, indicates that the parties did not intend for the exclusivity clause to have a set expiration date. (Pl.'s Br. at 7.)

After examining the relevant provisions of the CSA, I conclude that the plain language of paragraph 2 of the CSA demonstrates that the exclusivity clause was an amendment to the VAD. Such being the case, the exclusivity clause expired along with the expiration of the VAD.

To begin with, the plain language of the last sentence of paragraph 2 indicates that there are multiple amendments within paragraph 2 which are to be incorporated into the VAD. Contrary to BHP's assertion, the phrase "these changes" does not appear to only refer to the warranty provision discussed above. Rather, the warranty provision, by the language and structure of paragraph 2, appears to be part of a list of three changes. The paragraph as a whole states that "Rexnord agrees to hold its current prices firm . . . Rexnord *also* agrees to provide BHP with after-market exclusivity

10

*. . . In addition*, Rexnord agrees to modify the warranty terms." (emphasis added). The connecting terms indicate a list, and there is nothing in the plain language which would indicate that the warranty provision should be separate from the preceding two clauses.

Moreover, the modification of the warranty terms appears to be a singular change. Indeed, the warranty clause states that "Rexnord agrees to modify the warranty terms," and that "*This* is to be introduced. . . ." The word "This" indicates that the preceding change was singular. In other words, the plain language of paragraph 2 does not support an interpretation that the phrase "these changes" refers to the singular warranty change.

Further, the overall structure of paragraph 2 supports a finding that the exclusivity clause was merely an amendment to the VAD. First, the exclusivity clause is found in the middle of a paragraph entitled "Reaffirmation of VAD." It seems illogical that a clause completely separate from the VAD would be found within a paragraph which purports to reaffirm the VAD. Second, the exclusivity clause is preceded by a sentence which reaffirms the validity and supremacy of the VAD, and acknowledges that the VAD is to govern all prior and future transactions. To be sure, BHP contends that the sentence reaffirming the supremacy of the VAD states that only prior or future transactions are covered by the VAD, but not the present CSA. However, this same language indicates that the VAD, and any changes incorporated into the VAD, would still be the controlling document for future transactions. This would logically include future transactions for replacement parts.

Third, the final sentence of paragraph 2 discusses the incorporation of various changes into the VAD. Simply stated, paragraph 2 is completely structured around the terms of the VAD, either in reaffirming the supremacy of its terms or in discussing new terms to be incorporated into the VAD. Such being the case, it would not be reasonable to interpret the exclusivity clause as being

11

completely separate from the VAD. Rather, the most logical reading of the exclusivity clause is that it is a change incorporated into the VAD, and that the VAD, as the controlling document, controls the exclusivity clause's expiration date.

This conclusion is further supported by reading the language of the VAD together with paragraph 2 of the CSA. To be sure, BHP argues that the VAD should not be taken into consideration because it is outside the four corners of the CSA. However, it is proper to examine the language of the VAD because the VAD is explicitly referenced in paragraph 2 of the CSA, and the two agreements supplement each other. *See, e.g., Forge v. Smith*, 580 N.W.2d 876, 881 (Mich. 1998) ("When one writing references another for additional contract terms, the two writings should be read together."). Given that the final sentence of paragraph 2 states that parts of the CSA were to be incorporated into the VAD, it is appropriate to look at the VAD to see the effect these changes would have on the referenced document.

> Paragraph 3 of the VAD deals with exclusivity, and states:
>
> 3.      Territory and Appointment. The Company hereby appoints VAD its Value Added Distributor for component utilized in New Equipment Installations in the markets in the geographic area as set forth in Schedule B. (The markets and area are referred to in this Agreement as the "Customers" and the "Territory," respectively.) The VAD's sole remuneration for these direct to the Customer sales shall be the difference between its purchase price for the Product and the price charged its customers.
>
> 3.1     The appointment shall be on an exclusive basis for components for New Equipment Installations and retrofits. By exclusive is meant that the Company will not appoint additional distributors in the Territory to market the Products to new installations.
>
> 3.2     **The appointment shall be non-exclusive for all Replacement Parts**. (emphasis added)

(DPFOF ¶¶ 11, 12; McGrath Decl. ¶ 2, Ex. A; McGrath Decl. ¶ 9, Ex. L.)

Paragraph 3.2 of the VAD states that the parties were "non-exclusive for all Replacement Parts," and both parties agree that the term after-market exclusivity "refers to the demand for replacement parts for elevator installations after the initial installation." (PPFOF ¶ 12.) Therefore, paragraph 3.2 of the VAD essentially states that there is no after-market exclusivity. Reading the CSA and the VAD together, the plain language of both indicates that the exclusivity clause found in the CSA was an amendment to paragraph 3.2 of the VAD. Specifically, paragraph 2 of the CSA amends the VAD so that BHP became the exclusive distributor for after-market parts. Moreover, given the direct conflict between the two clauses, and the supremacy of the VAD, the exclusivity clause of paragraph 2 of the CSA constituted a change which had to be incorporated into the VAD to be given proper effect.

Moreover, that there is no language in the CSA which provides that the exclusivity clause expires with the VAD, or which provides that the after-market exclusivity is to be limited by the VAD, is not dispositive. The plain language of the CSA indicates that the exclusivity clause was an amendment to be incorporated into the VAD. Given that the exclusivity clause was thus part of the VAD, it would be superfluous to state that the exclusivity clause expires with the VAD.

Furthermore, that the clause immediately preceding the exclusivity clause does have an explicit expiration date does not mean that the exclusivity clause also required an expiration date in order for it to not be open-ended. The clause in which Rexnord agreed to hold its current prices firm had an expiration date of July 1, 2005, which was a date *prior* to the expiration date for the VAD. Without an explicit expiration date, the firm price amendment would have expired on the date the VAD expired. The earlier expiration date was an additional amendment incorporated into the VAD.

13

In contrast, the exclusivity clause, without this earlier expiration date, expired at the same time as the VAD's expiration.

BHP also argues that aspects of the CSA outside of the language in paragraph 2 support its position. First, BHP points to other language in the CSA apart from paragraph 2 to support its position that the CSA stands alone, and is not merely an amendment to the VAD. For example, BHP notes that both parties agree that the indemnification clause in the CSA is unlimited by time, and continues even after the expiration of the VAD. However, whether other clauses in the CSA are separate from the VAD is irrelevant to a determination of whether the specific clause at issue is an amendment to the VAD. Indeed, there may be other clauses in the CSA which do not constitute amendments to the VAD, and which last beyond the expiration of the VAD. Nevertheless, as noted above, paragraph 2 explicitly states that the changes in the paragraph are to be incorporated into the VAD, and the exclusivity clause is in direct conflict with a provision within the VAD. By contrast, the indemnification clause does not conflict with any provision of the VAD, and is not surrounded by language indicating that this clause is to be incorporated into the VAD.

BHP also argues that the CSA could not simply constitute an amendment to the VAD because BHP Engineers UK, Ltd. was not a party to the VAD. Although this may indicate that the CSA contained some additional promises to BHP Engineers UK, Ltd. which were separate from the original VAD, the terms of the VAD still controlled the relationship between both BHP entities and Rexnord. In the CSA, both entities are collectively referred to as "BHP," and paragraph 2 of the CSA reaffirms that the VAD still governs the relationship between BHP and Rexnord. Therefore, under the plain language of the CSA, the VAD was applicable to both BHP entities. An amendment incorporated into the VAD would likewise govern both BHP entities.

14

Given that the terms of the CSA are clear and unambiguous, there is no need to examine extrinsic evidence. Such being the case, BHP's motion to compel will be denied as moot.

In sum, under the plain language of the CSA and the VAD as written, the exclusivity clause in paragraph 2 of the CSA is an amendment which was incorporated into the VAD. As part of the VAD, the exclusivity clause expired along with the expiration of the VAD.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion for summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion to compel be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

**SO ORDERED** this 21st day of June 2007, at Milwaukee, Wisconsin.

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge